## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| TOYRI T. BRANDON, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-1461 |
| | ) | |
| NATIONAL CREDIT UNION | ) | |
| ASSOCIATION, *et al.*, | ) | |
| Respondents. | ) | |

### MEMORANDUM OPINION

Petitioner, a former member and shareholder of the now-defunct Shiloh of Alexandria Federal Credit Union ("Shiloh"), brings this action pursuant to 12 U.S.C. § 1787(d)(3) seeking judicial review of the National Credit Union Administration's ("NCUA")[1] denial of petitioner's request for share insurance. Following revelations that Shiloh's manager had been defrauding Shiloh, the NCUA placed Shiloh in receivership, and after determining that Shiloh's internal records were unreliable due to the manager's fraud and manipulation, undertook the task of reconstructing members' share accounts to determine what amounts each member should receive from the National Credit Union Share Insurance Fund ("NCUSIF"). The NCUA's reconstruction of petitioner's share account revealed a negative final account balance of $75,041.96. The NCUA accordingly denied petitioner's claim for share insurance. Petitioner contends that NCUA's reconstruction is inaccurate and that an accurate reconstruction would show that she is owed $19,432.58 in share insurance, the amount shown on her Shiloh account statement as of the date of liquidation. At issue on respondents' motion for summary judgment, therefore, is whether

---

[1] The amended complaint incorrectly identifies respondent NCUA as the National Credit Union *Association* rather than the National Credit Union *Administration*.

the administrative record shows that the NCUA's decision is not arbitrary, capricious, or otherwise not in accordance with law and is supported by substantial evidence. 5 U.S.C. § 706(2)(A).

I.²

The NCUA is tasked with (i) chartering and regulating federal credit unions and administering the NCUSIF and (ii) serving as the conservator or liquidating agent for federal credit unions that become insolvent. 12 U.S.C. § 1751 *et seq.* The NCUA Board is the managing body of the NCUA, consisting of three members appointed by the President. *Id.* § 1752a. When a federal credit union is liquidated, the Federal Credit Union Act ("the Act") requires the NCUA Board to pay insured deposits "as soon as possible" but grants the NCUA Board discretion in resolving insurance claims, including discretion to "require proof of claims to be filed." *Id.* § 1787(d). Where there is a dispute with respect to a share insurance claim, the NCUA Board "may resolve such disputed claim in accordance with regulations prescribed by the Board." *Id.* § 1787(d)(3)(A). Petitioner, a resident of Virginia and a former Shiloh shareholder, has such a disputed share insurance claim.

The now-defunct Shiloh was chartered in 1993 and served members of the Shiloh Baptist Church and other persons living, working, worshipping, or attending school within a designated area in Alexandria, Virginia. AR 13. Shiloh was not a particularly sophisticated institution. It

---

² The facts recited herein are derived from the administrative record (cited as "AR"), which was filed along with respondents' motion for summary judgment. The administrative record comprises the complete record of the NCUA's activity with respect to petitioner's account, including, *inter alia*, (i) all communication between petitioner and the NCUA, (ii) Shiloh's internal statement of petitioner's account, (iii) Shiloh's banking records with BB&T pertaining to petitioner's account, (iv) petitioner's pay stubs showing direct deposits into her Shiloh account, and (v) the methodology and reasoning of NCUA's employees and agents. In sum, as confirmed by NCUA counsel in the course of the hearing on summary judgment, the 1576-page administrative record contains every document pertaining to petitioner's Shiloh account.

operated out of a church building and was only open during limited hours on Saturdays and Sundays. AR 14. Further, Shiloh did not maintain its own cash vault but instead banked with an independent financial institution, BB&T bank. AR 576. When a member wished to make a withdrawal from her account, she would request a check which was drawn from the Shiloh BB&T account. *Id.* Conversely, a member's deposits into her Shiloh account were deposited into Shiloh's BB&T account, with a notation on the deposit ticket noting to which member account the deposit was to be credited. *Id.*

Since at least 2009, Shiloh was managed by John Dupree, Jr. ("Dupree"). AR 13. Although the board of directors for a credit union is charged with the general direction and control of the credit union's affairs, the Chairman of Shiloh's Board stated that Dupree was actually the only person who in fact could operate Shiloh. AR 14. Dupree kept two Shiloh computers at his personal residence., including one on which Shiloh's financial database, Fed Comp.

On March 27, 2013, Dupree contacted an NCUA district examiner and stated that the December 31, 2012 Call Report he had submitted to the NCUA on Shiloh's behalf incorrectly stated the total of non-member share deposits held by Shiloh.[3] AR 13. In response, the NCUA assigned an examiner to visit Shiloh to determine whether this purported recordkeeping error was correct and to review Shiloh's books and records. *Id.* The examiner was never able to meet with Dupree, however, because Dupree committed suicide on April 4, 2013, leaving a suicide note on a Shiloh computer confessing that he had defrauded the credit union. AR 15; 574 n.1. An

---

[3] Although credit unions typically receive deposits only from a limited "field of membership," low-income designated credit unions are allowed to grant shares to a wider class of non-member entities and natural persons. 12 C.F.R. § 701.34. By regulation, low-income credit unions are permitted to carry up to 20% in authorized non-member share deposits. 12 C.F.R. § 701.32(b)(1). Shiloh obtained low-income designation in 1994. AR 13.

ensuing investigation revealed that Dupree accepted millions of dollars in unrecorded non-member share deposits, embezzling millions of dollars for his own use and diverting other funds "to those in need." AR 14–16, 571 & n.1, 584. Dupree hid his fraud by manipulating members' account balances with fictitious deposits in order to balance the credit union's books and records. AR 14, 477–78.[4] Besides his intentional manipulation, Dupree was often inaccurate and untimely in posting member transactions to their accounts. AR 14, 477–78. The NCUA eventually determined that Dupree's fraud had cost the credit union more than $9.7 million. Answer ¶ 2.

On April 12, 2013, the NCUA Board found Shiloh to be insolvent. AR 9–11. Accordingly, pursuant to 12 U.S.C. §§ 1766(b)(1) and 1787(a)(1)(A), the NCUA Board placed Shiloh into involuntary liquidation, revoked its charter, and appointed itself as Shiloh's Liquidating Agent. *Id.* The NCUA Board further appointed agents of the liquidating agent ("ALA"), who informed Shiloh members of the insolvency and liquidation by mailing letters informing account holders that if their account balances were over $500, they were required to complete and return an enclosed "Member Confirmation and Affidavit" form in order to claim any remaining balance. AR 35–36. This letter enclosed a statement, drawn from Shiloh's internal records, showing the member's account balance as it stood on the date of liquidation. Petitioner's statement reported that she had a balance of $19,432.58. AR 45. The statement also showed that petitioner had purchased a $10,000 share deposit (which is analogous to a Certificate of Deposit or "CD") in November 2008 and that this share deposit was transferred upon its maturity to

---

[4] The regional summary report of the Shiloh liquidation notes that 92 share accounts went from negative to positive in April of 2013, shortly before Dupree's suicide and the discovery of the fraud. AR 15; *see also* AR 478. Petitioner's account appears to be one of these 92. As of January 12, 2013, the date of the last transaction on petitioner's Shiloh account before April, petitioner's account balance was negative $13,067.42, and then, on April 1, 2013, two large check deposits brought the balance up to $19,432.58, the amount reflected on petitioner's account statement at the time of liquidation. AR 45.

petitioner's share account in November 2009.[5] The account statement also reflected two outstanding loan balances of $2,753.27 and $29,792.66.[6]

On May 1, 2013, petitioner returned her "Member Confirmation and Affidavit" stating that she did not agree with the statement of her share or loan balances at liquidation. AR 49–56. Petitioner's letter stated that the member account statement she received did not accurately reflect $200 weekly deposits made automatically from her paycheck and did not reflect her purchase of a $10,000 share deposit. AR 51. Petitioner did not provide her own representation of what her account balance should have been, but simply challenged the number provided in the share account statement provided by the ALA. *Id.*; AR 584.

After further examination of Shiloh's records, the NCUA determined that the account summaries that were mailed to members in April 2013 were inaccurate as they were based on Shiloh records made unreliable by Dupree's manipulation of Shiloh's accounts. AR 478. Because the NCUA could not reconcile Shiloh's accounts based on Shiloh's own internal records, the NCUA subpoenaed Shiloh's BB&T account statements and cancelled checks in order to attempt to verify independently the members' deposits and withdrawals. AR 58–70. As this review began, on July 23, 2013, Elizabeth Martin, a fraud specialist with the Asset Management and Assistance Center ("AMAC") of the NCUA, sent a letter informing petitioner that the AMAC had performed a preliminary review of petitioner's account, but was awaiting

---

[5] The statement showed that the share deposit (referred to by petitioner as the "CD") was transferred to petitioner's regular share account on November 3, 2009. Both the accounting of the share deposit and the share account show that this transfer was made. *See* AR 45 (1099-01 account activity); AR 41 (1099 account activity showing "TRANSFER FROM 1099-001" of $10,240.02).

[6] The loan balances, which petitioner disputes, are not in issue in this suit because petitioner's entitlement to share insurance is unrelated to her liability for the balance of these loans. *See* AR 51.

additional bank records from outside Shiloh. *Id.* The letter further requested that petitioner send Ms. Martin at the NCUA any further records that would substantiate petitioner's share account balance at liquidation. *Id.* In response, petitioner provided Ms. Martin with her payroll records from the time that she opened her Shiloh account. AR 175–473.

To reconstruct petitioner's account, Ms. Martin, the fraud specialist, compared Shiloh's records of petitioner's account activity with Shiloh's BB&T banking records. *See* 486–501. Ms. Martin also consulted petitioner's pay stubs to substantiate petitioner's direct payroll deposits into petitioner's Shiloh account.[7] AR 577; *see* AR 174–473. Ms. Martin's review of these independent banking and payroll records substantiated a large portion of the account activity listed on petitioner's Shiloh member account statement, but also showed the following significant errors:

- The BB&T records showed approximately $17,600 in withdrawals that were not accounted for on petitioner's Shiloh member account statement but for which a check, payable to petitioner or her husband, Troy Brandon, had been issued and cashed. Accordingly, $17,600 was debited from petitioner's reconstructed account total.

- Further, petitioner's Shiloh member account statement listed $13,800 in check withdrawals for which no check against the BB&T account was found. Thus, an additional $13,800 was credited back to petitioner's reconstructed account total.

- Petitioner's Shiloh member account statement also listed $111,374.57 in deposits that could not be verified in the BB&T records. Many of these phantom deposits were in significant amounts, including a $20,000 deposit on October 1, 2009 and a $22,420 deposit on November 30, 2011. AR 577. Nevertheless,

---

[7] Member direct deposits were first deposited in corporate credit union accounts that Shiloh held at Mid-Atlantic Corporate Credit Union and later at First Caroline Corporate Credit Union. AR 22–23. As Shiloh's treasurer and manager, Dupree was responsible for then posting the direct deposits to the Shiloh account records. Not surprisingly, Dupree's recordkeeping in this regard was as poor as it was with other types of transactions, and thus petitioner's initial share account statement did not accurately reflect all of her deposits.

petitioner did not provide NCUA with documentation or any other explanation for these funds. The $111,374.57 in unsubstantiated deposits was thus reversed and was debited from petitioner's reconstructed account total.

- Finally, $21,000 in automatic payroll deposits that were not recorded in petitioner's Shiloh member account statement, but for which a valid pay stub record could be found, were credited to petitioner's account.

AR 576–77. Thus, after the foregoing account adjustments, the NCUA determined that petitioner's account was actually overdrawn by $75,041.96. AR 480.

On October 8, 2013, the NCUA sent petitioner a letter reporting the results of her account reconstruction. AR 480. Following this letter, on October 21, 2013, petitioner returned a second "Member Verification and Affidavit" protesting the NCUA's reconstruction of her account and arguing, again, that her direct payroll deposits were not considered and that the reconstruction failed to account for her $10,000 share certificate. AR 529. On February 6, 2014, the NCUA sent a formal "initial determination" letter to petitioner's then-attorney recapitulating the negative $75,041.96 balance at liquidation. AR 537. The letter further stated that rather than set up an overdraft loan for this amount, the NCUA would reduce petitioner's share balance to $0.00 at liquidation, meaning that petitioner would neither receive any share insurance proceeds nor owe any money to the NCUA as Shiloh's receiver. *Id.* Petitioner appealed this initial determination to the NCUA Board arguing, once again, that her $10,000 share deposit and payroll direct deposits had not accurately been considered in the NCUA account reconstruction. AR 540, 546. On August 1, 2014, the NCUA Board issued its decision upholding the determination that petitioner's share account had a negative balance of $75,041.96 as of the date of Shiloh's liquidation. AR 3–7. Specifically, the NCUA Board concluded that the liquidating agents had accurately reconstructed the account, had accounted for all of the automatic payroll deposits

7

reflected in the materials petitioner submitted in support of her appeal, and had taken into account the $10,000 share deposit. AR 3–4.

Following the NCUA Board's decision, petitioner filed an action with the U.S. Court of Appeals for the D.C. Circuit, which then transferred the case here on October 30, 2014, pursuant to 28 U.S.C. § 1631.

## II.

Analysis of the question presented appropriately begins by identifying the proper standard of review to apply to the NCUA Board's determination. The statute governing the NCUA answers this part of the question; 12 U.S.C. § 1787(d)(3) makes clear that the NCUA Board's decision regarding petitioner's claim for share insurance is "final agency action reviewable in accordance with chapter 7 of Title 5" of the United States Code. Title 5, the Administrative Procedure Act ("APA"), authorizes reviewing courts to set aside agency action, findings, and conclusions found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). Importantly, judicial review under the APA is conducted on the administrative record that was before the agency at the time of its decision, "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). In other words, the reviewing court in an APA case is concerned with whether the agency's conclusion is reasonable in light of the evidence at the agency's disposal at the time of its decision.

Despite this well-settled law that administrative review of agency action is on the administrative record, petitioner, citing no supporting authority, doggedly insists on the necessity of obtaining discovery. Petitioner's counsel contends that petitioner is unable "to verify or

confirm" the content of the administrative record without being granted access to bank records,[8] Shiloh's computer systems, and depositions of NCUA staff. This contention misunderstands the governing law. In the normal course of an APA case, there is no need for discovery because judicial review of agency action is confined to the administrative record of the proceedings before the agency. Supplementation of the administrative record in an APA case is appropriate only in very limited circumstances, such as:

> (i)   if it appears that the agency relied on documents or materials not included in the record or if the agency deliberately or negligently excluded documents that may have been adverse to its decision;
>
> (ii)  if background information is needed to determine whether the agency considered all the relevant factors, or to permit explanation or clarification of technical terms or subject matter; or
>
> (iii) if the agency so failed to explain administrative action that it frustrates judicial review.

See *Camp v. Pitts*, 411 U.S. at 143; *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010); *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982); *see also Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995) (noting that "there may be circumstances to justify expanding the record or permitting discovery"). In short, petitioner's argument pursuant to Rule 56(d), Fed. R. Civ. P., that summary judgment is premature because she cannot present essential facts to justify her position is unpersuasive. Summary judgment on the administrative record in an APA review case is *not* premature simply because there has been

---

[8] Of course, the administrative record includes all of Shiloh's BB&T bank records relevant to petitioner's account, as well as hundreds of pages of petitioner's payroll records and a detailed spreadsheet showing each transaction listed on petitioner's Shiloh account and whether and how that transaction was substantiated based on these records.

no discovery. More importantly, petitioner has not demonstrated that any of the conditions that might justify supplementation of the administrative record are met in this case.

Moreover, petitioner's cry for discovery is particularly unpersuasive given respondents' assertion at oral argument that the administrative record contains every scrap of paper that petitioner could possibly need to assess the NCUA's reconstruction of petitioner's account. Hearing Tr. at 6 (March 13, 2015).[9] Rather than engage the information in the administrative record to show that the record excludes documents or hides the real reason for respondents' decision, petitioner simply persists in arguing for discovery. This remains true even after petitioner was granted—as a matter of the Court's grace, not of petitioner's right—the opportunity to depose Elizabeth Martin, the fraud specialist who conducted the reconstruction of petitioner's account. *See Brandon v. Nat'l Credit Union Association*, 1:14cv1461 (E.D. Va. March 13, 2015) (Order). Petitioner's supplemental briefing following this deposition barely referenced the deposition and certainly pointed to no bias, negligence, or other infirmity in the reconstruction process that would demonstrate a need for supplementation of the administrative record.

Finally, petitioner contends that the administrative record should be disregarded because petitioner's Fifth Amendment due process rights have been violated. Specifically, petitioner

---

[9] Petitioner's counsel insisted at oral argument that although the spreadsheet of petitioner's account reconstruction showed over 500 transactions, petitioner only had access to 120 of those transactions. Petitioner's counsel is clearly mistaken; the administrative record includes records corresponding to every substantiated transaction on the NCUA account reconstruction spreadsheet, including every cancelled check representing a withdrawal from petitioner's account, every pay stub documenting a direct deposit into petitioner's account, and every other deposit *for which there was a record*. Those transactions for which there is no documentary substantiation were, understandably, not counted in NCUA's reconstruction of petitioner's account and the NCUA account reconstruction spreadsheet clearly indicates when no verification for a particular transaction could be found. Thus, contrary to petitioner's contention, the administrative record contains the full accounting of all 500 transactions detailed on the NCUA's account reconstruction spreadsheet.

contends that the administrative record is unreliable because it "does not reflect due process to the [petitioner] due to the property rights being denied by the NCUA." Pet.'s Opp. at 6. Importantly, petitioner does not allege a Fifth Amendment due process cause of action in her complaint; the due process argument is raised for the first time in petitioner's brief opposing summary judgment. Nonetheless, petitioner's argument in this regard is meritless. Even assuming, *arguendo*, that share insurance constitutes a protected property right of which petitioner has been deprived, the process that she received is constitutionally sufficient.

Pursuant to the Supreme Court's balancing test in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), a court must consider the sufficiency of the procedures provided based on (i) the significance of the private party's protected interest, (ii) the government's interest, and (iii) the risk of erroneous deprivation of the protected interest. Here, petitioner was provided a detailed accounting of her share account reconstruction and multiple opportunities to object and to provide her own evidence of what her account balance should have been, as well as an opportunity to appeal the initial determination to the NCUA Board. *See* AR 475, 480–514, 529–30, 540–43. The additional process that petitioner contends she was entitled to—for instance, access to Shiloh's computers and an opportunity to cross-examine the fraud specialist who reconstructed her account in an adversarial proceeding—is clearly not necessary to avoid the risk of erroneous deprivation and no authority has been cited or exists to support such an argument. In short, to the extent that petitioner was entitled to due process with respect to the share insurance determination, the process she received was constitutionally adequate.

In sum, petitioner's dogged and meritless insistence on entitlement to discovery distracts attention from the sole question raised by petitioner's suit, namely whether the NCUA's decision that petitioner had no entitlement to any federal share insurance payout was reasonable, non-

arbitrary, and supported by substantial evidence *based on the administrative record before the agency at the time of its decision.* In other words, the important point that petitioner's counsel ignores is that to prevail on petitioner's claim, petitioner must demonstrate that *the administrative record* does not support the NCUA's decision. For the reasons that will be further explained below, petitioner has utterly failed in this task.

III.

A review of the administrative record points persuasively to the conclusion that the NCUA's determination that petitioner's Shiloh share account was overdrawn and thus that she was not eligible to receive a share insurance payout was a reasonable determination well supported by substantial evidence.

First, the NCUA's decision to rely on Shiloh's BB&T records and other extrinsic evidence instead of Shiloh's internal records was undoubtedly reasonable given the careless and fraudulent recordkeeping of Shiloh's deceased manager. The administrative record shows that Shiloh's manager, Dupree, manipulated member accounts with fictitious deposits in order to balance the credit union's books and to conceal his fraud. Respondents reasonably concluded that Dupree's willful manipulation, combined with his otherwise poor bookkeeping practices, rendered Shiloh's internal records unreliable. Moreover, the administrative record shows that Shiloh's BB&T banking records would provide an accurate paper trail from which to reconstruct member accounts because every deposit or withdrawal from Shiloh member accounts was effectuated by a deposit into, or withdrawal from, Shiloh's BB&T account. *See* AR 13–14; *see also* AR 76–173 (showing checks made out to Toyri Brandon drawn from Shiloh of Alexandria BB&T account). In fact, the NCUA reasonably concluded that the BB&T records were reliable because there was a clear link between the majority of Shiloh's recorded member transactions

12

and the corresponding transactions in the BB&T records. AR 576. Thus, the BB&T records are reliable to substantiate petitioner's account history because they document the actual movement of funds in and out of petitioner's Shiloh account. Accordingly, the NCUA's use of these records to determine petitioner's share account balance was reasonable.

Petitioner evidently believes that the NCUA's reliance on the BB&T records was arbitrary and capricious, arguing that the BB&T records were likely also falsified and tainted by Dupree's fraud. Complaint ¶¶ 28–29.[10] Of course, as the administrative record reflects, it was *Shiloh*'s bookkeeping that was infected by Dupree's fraudulent manipulations. Nevertheless, petitioner seems to believe that the NCUA itself concluded that reliance on the BB&T records "would be misplaced." Yet, the record clearly shows that this reference to misplaced reliance was with respect to Shiloh's *internal* records, not the BB&T records. *See* AR 4.[11] Beyond pure speculation, petitioner has not pointed to a scintilla of evidence that the BB&T records were falsified or unreliable. Moreover, petitioner's concern with the accuracy of the BB&T records is difficult to square with her position that she is entitled to $19,432.58 in federal share insurance, the amount in her share account on the date of liquidation as reflected in Shiloh's *admittedly*

---

[10] Petitioner contends in her opposition brief that the NCUA took the position in civil litigation against Dupree's estate that Dupree "altered and laundered Shiloh's BB&T bank records." Pet.'s Br. in Opposition to Summary Judgment at 18. A review of the complaint in that case, *Nat'l Credit Union Admin. Bd. v. Dupree*, 1:13-cv-1419 (E.D. Va. Nov. 19, 2013) (Complaint), discloses no allegation or admission by NCUA with respect to any inaccuracy of the BB&T bank records.

[11] The statement in the administrative record that petitioner relies on is this: "Ordinarily, the Liquidating Agent can reasonably rely on the records *of the institution* in determining the amount the members have in their share accounts. In cases like this one, however, where fraud and embezzlement occurred, and the account records were manipulated to disguise that illicit activity, reliance on the account records would be misplaced." AR 4 (emphasis added). The reference to "the institution" clearly refers to Shiloh's internal records, not BB&T's.

13

*fraudulent* records. Petitioner has, in fact, admitted to the inaccuracy of Shiloh's internal record of her account, stating in an affidavit:

> I did review the transactions of the records on my account 1099 from the NCUA. The spread sheet *had numerous unverified deposit and withdrawal records.* These records were not true because *I have never placed large sums of money into my account* except by check for a CD, $10k deposit, all other large deposits are Dupree deposits that he put into my account. I had no prior knowledge of these deposits, but *they are sham deposits*, they are Dupree's deposits."

Pet.'s Feb. 13, 2015 Affidavit ¶¶ 8–9 (emphasis added). Petitioner's reliance on the Shiloh records is completely unwarranted. Yet, even taking the Shiloh records at face value, petitioner would be hard-pressed to explain her entitlement to a $19,432.58 share insurance payout. Prior to two large deposits of $24,500 and $8,000 on April 1, 2013, just days before Dupree's suicide and the revelation of his fraud, the Shiloh records show that petitioner's account was overdrawn by $13,067.39. In fact, the NCUA found that many Shiloh member accounts received large deposits on April 1, 2013 that were inconsistent with the members' deposit history. Petitioner has not provided any explanation for or documentation of the April 1, 2013, deposits, and the circumstances strongly suggest that these were, in petitioner's words, "sham deposits."

Furthermore, petitioner provides no coherent or persuasive explanation for why the Shiloh account statements are more accurate than the NCUA's painstaking reconstruction of petitioner's account from the actual paper trail of BB&T banking records, cancelled checks, and petitioner's own pay stubs. And besides the admittedly inaccurate Shiloh records, petitioner has provided absolutely no independent support for calculating her share account balance to be $19,432.58. Accordingly, it is clear that the NCUA's decision not to rely on this unsubstantiated account balance is entirely reasonable as that balance was based on the uncontrovertibly falsified

Shiloh records. This decision by the NCUA is the opposite of arbitrary and capricious agency action; it is reasonable and sensible and supported by substantial evidence in the record.

Petitioner's other alleged specific errors are equally unpersuasive. First, petitioner persists in the view that respondents failed to count the totality of her automatic payroll deposits and failed to account for the $10,000 share deposit she purchased in November 2008. With respect to the payroll deposits, petitioner estimates—without providing any basis for the estimate—that the NCUA failed to account for $37,175 in direct payroll deposits. Yet importantly, petitioner provides no evidence to support this claim or any claim that her payroll deposits were not accurately calculated in the NCUA account reconstruction. The NCUA account reconstruction spreadsheet showed that approximately $6,000 worth of automatic payroll deposits credited in the Shiloh records could not be verified, but also that the Shiloh records failed to account for $21,000 of automatic payroll deposits reflected in petitioner's payroll records. *See* AR 486–97, 175–473. Accordingly, the NCUA's reconstruction of petitioner's account resulted in petitioner receiving a net $15,000 gain from Shiloh's record of her payroll deposits based on the NCUA's careful accounting of petitioner's payroll records. And again, petitioner provides no documentation or evidence to support any claim that NCUA's accounting was arbitrary, capricious, or unsupported by the evidence.

Next, although petitioner insists that she has not been given credit for her $10,000 share deposit, the NCUA's account reconstruction spreadsheet clearly shows to the contrary, reflecting instead that her $10,000 investment was folded back into her share account in November 2009 together with an additional $240.22 in interest. AR 490 (deposit on November 3, 2009 – TRANSFER FROM 1099-001). Thus, in sum, both petitioner's properly documented automatic payroll deposits and her $10,000 share deposit were fully accounted for in respondents'

reconstruction and final determination that petitioner was not entitled to any share insurance payout.

Second, petitioner contends that the NCUA's account reconstruction spreadsheet improperly counted unauthorized withdrawals from her account. Specifically, petitioner contends that (i) withdrawals made out to her husband, Troy Brandon, which amount to $16,064,[12] and (ii) withdrawals made out as loans to other individuals, which amount to $4,750,[13] should not have been counted against her balance. In support, petitioner argues that her account was a single-shareholder account and that she was the only person authorized to make withdrawals and thus that any withdrawals made by other persons should not have been counted in the NCUA's reconstruction. This argument also fails. As an initial matter, the relevant question with respect to these withdrawals is whether the agency's decision to include them in the account reconstruction displays "a 'rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In this regard, the agency's decision must be upheld so long as it was reasonable given the evidence before the agency, even if the evidence could also support a different conclusion. With this in mind, it is clear that the agency reasonably concluded that the withdrawals made by petitioner's husband, Troy Brandon, and the apparent loans made to unrelated third parties should be counted in the

---

[12] This is the total of all withdrawals made through checks made out to Troy Brandon, found at AR 80–86, 90, 92, 97–99, 100, 103, 104, and 1046, and as listed in the reconstruction spreadsheet at AR 486–97. This total does not include one $3,000 withdrawal check issued on August 8, 2009, and endorsed by both Troy and Toyri Brandon. AR 1049.

[13] These withdrawals were credited against petitioner's account in the reconstruction because the memo lines of the withdrawal checks stated "loan from Toyri Brandon" or "Toyri Brandon." *See* AR 131, 133, 145, 1058, 167. Petitioner does not affirmatively contend that she did not make these loans, but merely implies that these were unauthorized. *See* Pet.'s Supp. Br. at 3–4.

NCUA account reconstruction. First, the NCUA's conclusion that these were legitimate withdrawals is supported by the fact that each of these checks is accounted for in both the Shiloh logs and the BB&T records. Second, many of the withdrawal checks were signed by parties other than Dupree, indicating that they were not vehicles of Dupree's fraud. Third, the administrative record clearly shows that these were not phantom withdrawals but checks that were, in fact, drawn from the BB&T account and cashed. Fourth, one withdrawal check from August 8, 2009, was made out to and endorsed by both petitioner and her husband, indicating petitioner's knowledge that her husband was able to make withdrawals from the account. AR 1049. Finally, petitioner failed to raise any objection during the NCUA administrative process to the agency's decision to count these withdrawals even though the withdrawals were included on the NCUA account reconstruction spreadsheet sent to petitioner on October 8, 2013. *See* AR 480–514. Thus, the NCUA's conclusion that these third party withdrawals were legitimate was reasonable in light of the record before the agency. Significantly, even assuming that the apparent loans and the withdrawals by petitioner's husband, Troy Brandon, were illegitimate and should not have been counted, petitioner would still be left with a negative share account balance of $54,200.96 and accordingly petitioner still would not have received a share insurance payout.

Petitioner next contends that the reconstruction should not have counted five $650.00 withdrawals representing payments toward a $32,000 loan account that petitioner disputes she opened. The validity of this disputed loan is not in issue in this suit, but petitioner argues that because she did not originate or benefit from this loan, the payments debited from her account are fraudulent and should not have been counted in the NCUA's reconstruction of her account. Although NCUA maintains the validity of this disputed loan, respondents concede, for the purposes of this litigation, that the loan payments may be disregarded and thus that $3,250

17

should be credited back to petitioner's account. Yet, even if petitioner is given credit for the alleged unauthorized withdrawals already discussed *and* credit for the $3,250 in loan payments, petitioner would still have a negative share account balance of $50,950.96. Accordingly, petitioner still would not have been entitled to any share insurance payout.

Finally, in a last-ditch effort to bring her account into the positive realm, petitioner contends in a new affidavit that between November 2007 and April 2013, she deposited $26,450 in cash into her account that is unaccounted for in the NCUA's account reconstruction spreadsheet. Pet.'s May 18, 2015 Affidavit. Petitioner contends that she obtained these funds from (i) settlement proceeds from a car accident, (ii) an inheritance following her father's death, and (iii) a gift from her mother. This contention fails to provide any basis for concluding that the NCUA's reconstruction of her share account without this alleged $26,450 was arbitrary, capricious, or unsupported by substantial evidence. First, petitioner failed to inform the NCUA about these alleged cash deposits during the administrative process or to provide the NCUA any affidavits, documentation, or other information regarding these alleged cash deposits. In fact, the record reveals no allegation about cash deposits until the start of this litigation. Second, petitioner's last-minute, self-serving affidavit in support of this $26,450 is inconsistent with her earlier affidavit in which she affirms that she received money following her father's death and a car accident in which she was injured, but does not mention any gift from her mother and does not state what amounts she received. *See* Pet.'s Feb. 13, 2015 Affidavit ¶ 20. Third, with respect to the car accident and inheritance proceeds, petitioner has not provided any documentary evidence that would substantiate her claim that she received this money, much less deposited it in her Shiloh account, even though personal injury settlement and inheritance following a parent's death are typically events which generate a paper trail. Finally, petitioner previously

18

disclaimed the large, unsubstantiated deposits reflected in the Shiloh records as "sham deposits" earlier in this litigation. *See* Pet.'s Feb. 13, 2015 Affidavit ¶ 9 ("I have never placed large sums of money into my account except by check for a CD, $10k deposit, all other large deposits are Dupree deposits that he put into my account."). For these reasons, the NCUA's decision not to count $26,450 in alleged cash deposits in the reconstruction of petitioner's account was reasonable, non-arbitrary, and not capricious. Moreover, because petitioner failed to inform the agency of these alleged cash deposits and because the administrative record is devoid of any evidence that these deposits occurred, the NCUA's reconstruction of petitioner's share account balance without these alleged deposits was unquestionably supported by the record evidence before the agency at the time of its decision.

Finally, petitioner's argument that the NCUA's determination of her account balance cannot be trusted because the NCUA has a self-interest in avoiding paying out share insurance must be briefly addressed. Petitioner alleges that the NCUA was biased in favor of finding negative account balances in order to avoid making share insurance payments because the NCUSIF fund also provides the NCUA's operating budget. This unsupported allegation of bias is insufficient to upset the presumption of honesty and integrity of NCUA's administrators. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Furthermore, in *Doolin Sec. Savings Bank, FSB v. FDIC*, 53 F.3d 1395, 1405 (4th Cir. 1995), the Fourth Circuit rejected a similar argument about bias against payouts from the Federal Deposit Insurance Corporation ("FDIC"). There, the Fourth Circuit held that although "all agencies inherently have some level of 'institutional bias,' . . . such an interest does not render all agencies incapable of adjudicating disputes within their own proceedings given the strong public interest in effective, efficient, and expert decisionmaking in the administrative setting." *Doolin*, 53 F.3d at 1407. Accordingly, in the

19

absence of specific and convincing evidence to the contrary, petitioner's allegations of agency bias must be disregarded.

In sum, it is clear that the NCUA's conclusion that petitioner was not eligible for a share insurance payout was supported by substantial evidence and was not arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2). Even assuming, *arguendo*, that respondents erred by (i) counting withdrawals made by petitioner's husband and loans made to third parties, (ii) counting payments made on the disputed loan, or even (iii) failing to account for the $26,450 in cash deposits that petitioner failed to inform the NCUA of until this litigation, petitioner is unable to show that she was harmed thereby, as her share account would still have been several thousand dollars overdrawn.[14] Thus, even if the NCUA erred in calculating petitioner's account balance in the ways described, petitioner has failed to show that any alleged agency error was prejudicial because she still would not have received a share insurance payout. *See Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999) (holding that the party asserting agency error in a § 706(2) action must show that the error was prejudicial). Accordingly, respondents' motion for summary judgment must be granted.

An appropriate Order will issue.

Alexandria, Virginia
July 10, 2015

/s/

T. S. Ellis, III
United States District Judge

---

[14] If the allegedly unauthorized withdrawals, loan payments, and cash deposits are counted in petitioner's favor, petitioner's would still have a negative account balance of $24,500.96. This total does not count the following amounts which petitioner contends should be credited to her account: (i) a $3,000 withdrawal check which both petitioner and her husband endorsed, (ii) the $10,000 share deposit that was clearly deposited back into her share account in 2009, with interest, and (iii) the unsubstantiated $37,175 of automatic payroll deposits that petitioner claims went uncounted.